IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs December 1, 2020

**LARRY MICHAEL BERKLEY v. STATE OF TENNESSEE**

**Appeal from the Circuit Court for Lauderdale County
No. 9714    Joseph Walker, Judge**

_____

**No. W2019-02215-CCA-R3-PC**

_____

The petitioner, Larry Michael Berkley, appeals the denial of his petition for post-conviction relief, which petition challenged his multiple convictions of rape, aggravated statutory rape, sexual battery by an authority figure, and statutory rape by an authority figure, alleging that he was deprived of the effective assistance of counsel. Discerning no error, we affirm the post-conviction court's denial of post-conviction relief.

**Tenn. R. App. P. 3; Judgment of the Circuit Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which ROBERT H. MONTGOMERY, JR., and TIMOTHY L. EASTER, JJ., joined.

Bo Burk, District Public Defender, and David Stockton, Assistant District Public Defender, for the appellant, Larry Michael Berkley.

Herbert H. Slatery III, Attorney General and Reporter; Sophia S. Lee, Senior Assistant Attorney General; Mark E. Davidson, District Attorney General; and Julie Pillow, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

The Lauderdale County Grand Jury indicted the petitioner with 14 counts of various sexual offenses against three juvenile victims, C.E., J.H., and M.C.[1], each of whom he met while serving as pastor at Victory Baptist Church. _State v. Larry Michael Berkley_, No. W2015-00831-CCA-R3-CD, slip op. at 1-2 (Tenn. Crim. App., Jackson, May 17, 2016). This court summarized the evidence on direct appeal. As to victim C.E.,

---

[1] To protect the anonymity of the victims, we will refer to them by their initials.

the evidence showed that C.E. visited [the petitioner] at his house on April 18, 2010. Upon his arrival, C.E. was given alcohol and shortly thereafter, began feeling impaired. C.E. was asked to come upstairs by [the petitioner] and B.B. and went along, believing he would be allowed to sleep off his impairment before going home. Instead, he was placed on [the petitioner's] bed, at which point [the petitioner] penetrated his anus with his finger. C.E. did not consent to this penetration.

*Id.*, slip op. at 9.

As to victim J.H.,

. . . . J.H. testified that he was thirteen years old when he stayed at [the petitioner's] house in February of 2012. After falling asleep in [the petitioner's] bed, he awoke between one and two in the morning to [the petitioner's] fellating him. The following morning, [the petitioner] asked J.H. if he had done "anything weird last night," and J.H. said he had not out of fear of [the petitioner's] reaction.

*Id.*

Finally, as to victim M.C.,

. . . . The proof shows that [the petitioner] engaged [in] unlawful sexual contact with M.C. on three separate occasions when M.C. was fifteen years old and [the petitioner] was thirty-one. The first incident occurred at the church and when M.C. engaged in oral and anal sex with [the petitioner] in exchange for five hundred dollars. On the second occasion, M.C. engaged in oral sex with [the petitioner] at the church and was paid three hundred dollars. On the third occasion, M.C. was paid one hundred dollars for engaging in oral sex with [the petitioner] at his home in Durhamville, Tennessee. . . . Finally, [the petitioner] was the pastor at the church M.C. attended and used the church facilities for at least two of the sexual encounters with M.C.

*Id.*, slip op. at 11.

The jury convicted the petitioner as charged, and, after merging appropriate offenses, the trial court imposed an effective sentence of 35 years' incarceration. *Id.*, slip op. at 7.

The petitioner filed a timely pro se petition for post-conviction relief, raising myriad claims of ineffective assistance of counsel. After the appointment of counsel, the post-conviction court held an evidentiary hearing.

At the November 2019 evidentiary hearing, the petitioner testified that trial counsel discussed the issue of severance with him only "vaguely," stating that when he asked counsel about severance, counsel told him "you can't handle three trials." The petitioner said that he wanted separate trials despite counsel's telling him that the petitioner's "emotional state" was too fragile to handle separate trials. He also asserted that trial counsel did not explain the risks and benefits of severance. He believed that the State used the fact that his case involved multiple victims to bolster the credibility of each of the victims.

The petitioner stated that had counsel sought a bill of particulars, he would have "know[n] exactly what the State is intending to put forward," which information, he asserted, would have enabled him to address certain inconsistencies in the evidence. He pointed out that the indictment alleged that the offenses against M.C. occurred from August to December 2012, but that the day of trial, the State amended the indictment alleging that those offenses occurred in 2011. The petitioner stated that a bill of particulars would have brought the State's error in the alleged timeframe to light sooner, allowing him to prepare a proper defense. He stated, however, that when the State moved to amend the indictment, trial counsel told the court that he did not object to the motion. He alleged that when he told counsel, "I do object," counsel replied, "[T]hey'll just . . . reindict you this afternoon." The petitioner stated that had counsel objected to the State's motion to amend the indictment, he would have prevailed on the nine counts related to M.C. because he had an alibi for the 2012 dates. He contended that, in the very least, the trial court would have severed those nine counts to permit the petitioner time to prepare a defense for the amended timeframe.

The petitioner testified that counsel also failed to respond to the State's request for notice of an alibi defense. The petitioner believed that because counsel did not provide the State with an anticipated alibi defense for the alleged 2012 offenses against M.C., counsel "never intended on me fighting" those charges.

The petitioner stated that, during jury voir dire, trial counsel asked the following questions of and made the following statements to potential jurors: "'Can you think of any reason [the petitioner] might not testi[fy] today? Would you hold it against

-3-

him? Not really, but you would think he would testify on his behalf to make sure everybody knows his story.'" "'I think something was wrong if he didn't testify, because he's a pastor. He's got nothing to be afraid of. He's an innocent man. Fear not, trust the Lord, get up there and speak your peace[.]'" The petitioner believed that these questions and statements by counsel "basically taint[ed] the jury pool" against him. The petitioner also stated that during voir dire, a potential juror indicated that he knew the families of two of the victims well. Before striking that potential juror, trial counsel continued to question him, allowing the potential juror to state that he "hated child molesters. They're the world's worst." The other members of the jury pool heard these statements.

The petitioner alleged that trial counsel's failure to strike Juror A from the jury prejudiced his case because Juror A knew one of the victims and his family. Although Juror A, an alternate juror, did not participate in deliberations, the petitioner stated that she may have influenced the others when the jury recessed from the courtroom. He stated that he also found "it very peculiar that she was the one that came off at the very last minute."

The petitioner stated that trial counsel failed to support his motion to suppress the petitioner's resignation letter from Victory Baptist Church with certain emails regarding allegations that led to his resignation. He stated that the resignation letter's reference to his having "done some things unbecoming a pastor" was "extremely vague" and prejudicial. The petitioner acknowledged that counsel objected to admission of the letter and that the trial court admitted it only for limited purposes. He stated, however, that he was prejudiced by the admission of the letter because the State repeatedly used the letter beyond that limited purpose. The petitioner also said that trial counsel failed to offer the victims' handwritten statements during cross-examination despite those statements being inconsistent with the victims' trial testimony.

The petitioner testified that he discussed a potential change of venue with trial counsel but that counsel did not explain to him why he did not seek a change of venue. He said that counsel indicated to him that a change of venue would be easy to obtain because "all he had to do was go out and find a few people that would . . . sign, basically, a statement saying that I couldn't get a fair" trial. The petitioner stated that his case "made every single news outlet that you can possibly mention" and "made every single paper," including the Associated Press. He contended that "almost everybody in that potential jury pool knew somebody associated with the church" because the church "was active in the community." He also said that he "was a pretty well-known person in the county."

The petitioner stated that trial counsel failed to object to the prosecutor's inappropriate and inaccurate statements, including those about how a pastor should dress, asserting that the petitioner displayed a fake college diploma on his office wall, stating that the petitioner had never been diagnosed with cancer, and implying that there were other

victims who were too scared to come forward with allegations against the petitioner. The petitioner stated that counsel also failed to object to numerous inconsistent statements by the State's witnesses. By way of illustration, he stated that Pam Nemo testified that she was present during a conversation with a victim while Ms. Nemo's daughter testified that Ms. Nemo was not present for that conversation. He further stated that counsel failed to object to the State's offering evidence that one incident involving M.C. occurred at the petitioner's house despite the indictment's alleging that all incidents involving M.C. occurred at the church.

The petitioner contended that trial counsel failed to cross-examine the State's witnesses or present evidence about inconsistencies in the timeline of events. The petitioner stated that he passed counsel sticky notes throughout the trial drawing counsel's attention to inconsistencies but that counsel failed to address the issues. He also said that despite the trial court's cautioning the prosecutor to avoid asking witnesses about evidence previously excluded, trial counsel failed to move for a mistrial when the prosecutor used the names of juveniles associated with the church in contravention of the trial court's order. Additionally, he stated that trial counsel failed to introduce evidence of J.H.'s treatment at a mental hospital prior to the offenses for issues related to his sexuality and that counsel failed to present evidence that M.C.'s family had previously made false accusations against the petitioner and harbored ill will toward him.

During cross-examination, the petitioner acknowledged that he wanted counsel to seek severance in this case and that having multiple trials did not concern him. He said that counsel made the decision to forgo a severance motion. The petitioner contended that he was unaware of the State's intent to amend the indictment until the morning of trial.

The petitioner acknowledged that Juror A was an alternate juror, but he maintained that she was present with the jury during jury-out hearings and believed that she "could prejudice everybody against me" despite her not deliberating with the jury. He stated that he was forced to testify because trial counsel had "asked every single jury member if I was innocent, would I take the stand, and they said yes." He denied that he had a false college diploma. The petitioner stated that the jury was ill-equipped to judge the credibility of witnesses because trial counsel failed to challenge the inconsistencies in certain statements, which evidence was vital to his defense strategy of attacking the witness's credibility. He explained that his trial counsel's primary defense strategy was to emphasize that the petitioner was a pastor and a religious leader and was more credible than the victims; he alleged that counsel failed to pursue that defense, however, when he failed to challenge inconsistencies in the evidence.

The petitioner explained that in 2012, M.C.'s father, a deacon in the church, accused him of "smoking dope" with M.C. The petitioner voluntarily took a drug test the following day that showed that he had no drugs in his system. The petitioner said that he reviewed all of the discovery materials that trial counsel provided him but that nothing indicated that the State would present evidence that one incident involving M.C. occurred at the petitioner's house and not at the church.

Trial counsel testified that when he discussed a potential severance of the offenses against each victim, the petitioner indicated that "he could not handle three separate trials." He noted that at that time, the petitioner had similar charges pending in Arkansas, and because counsel deemed the present case to be the weaker of the two, the petitioner "elected to go forward with one trial" and "wanted to get it over as fast as possible." He also explained that because the petitioner had not made bond, three separate trials would have dragged out the process and, even if the petitioner were acquitted at the first trial, he would remain incarcerated pending the second and third trials.

Trial counsel stated that a bill of particulars was unnecessary in this case because "we had full discovery so we knew about what the witnesses were going to say, where things were, as well as the dates." He acknowledged that the State amended the indictment "right before trial" but stated that the amended allegations were not "anything that we didn't already know" and that he was hoping the prosecutor would not catch the erroneous dates in the indictment. He said that he discussed the State's amending the indictment with the petitioner and explained to him that if he objected to the amendment, the State would obtain a superseding indictment which would simply delay the process, and the petitioner "wanted to press forward."

Trial counsel acknowledged that he had the victims' written statements "well ahead of time" and that he did not introduce them at trial, explaining, "I think I was mainly concerned with cross-examining." He acknowledged some inconsistencies in the witness's testimony but stated that he did not point them out because he did not want to give the witnesses "the opportunity to correct" their statements or to give the State the opportunity to "rehab the witnesses." He also explained that because the victims were juveniles, he "wanted them up and down as quickly as possible, because the jury is already looking at them." He said that he decided not to introduce the handwritten statements as a strategic decision to avoid "open[ing] too many doors."

Trial counsel acknowledged that he did not move for a mistrial when the State disregarded the court's ruling on exclusion of certain evidence but explained that he objected to the State's use of the evidence and that "the Court sustained that objection." He said that he "did not feel that it had risen to that level of a mistrial at that point in time." He further pointed out that he wanted to avoid drawing attention to the damaging

testimony; "I mean, it was a tactical decision after the objection, but I really did not want to highlight, continue highlighting this testimony that [the prosecutor] was bringing out."

During cross-examination, trial counsel acknowledged that in its election of offenses, the State alleged that one incident involving M.C. occurred at the petitioner's home. He said, however, that he was not surprised by that allegation and was not blindsided by M.C.'s testimony. He explained that his primary defense strategy was to emphasize that the petitioner "was a well-respected pastor. There was no physical evidence in this case, so it literally was a he said, he said case." He stated that he questioned the jury on their beliefs about whether an innocent person would decline to testify because the petitioner maintained his innocence and because he wished to strike any juror who believed that they "absolutely must hear from the defendant." He denied that the petitioner was forced to testify as a result of counsel's jury voir dire. He stated that he and the petitioner discussed whether the petitioner would testify "all the way up to the time I put him on the stand" and that the petitioner elected to testify on his own accord.

Trial counsel acknowledged that the petitioner raised inconsistencies in witness's testimony during trial, but counsel believed them to be trivial matters and that his addressing them could confuse the jury. He stated, "You can't unring a bell, but if you ring a bell quiet enough, you can let it go right past the jury. But if you continue objecting and pointing out minor inconsistencies, in my experience, you turn the jury off, and they stop listening to you."

Counsel recalled discussing with the petitioner J.H.'s prior stay in a mental hospital but stated that he was unable to obtain J.H.'s medical records to confirm the information. He said that he also feared turning the jury off by questioning a 14-year-old witness about his sexuality. Additionally, he noted that such questioning could open the door to damaging information and that J.H.'s sexuality was not particularly relevant to the defense.

Trial counsel acknowledged that he did not file a response to the State's request for an alibi defense, stating that he hoped that the State would not notice its error in the dates in the indictment and that he could present a solid defense as to those counts at trial. He said that he could have presented an alibi defense as to the original dates alleged in the indictment for the offenses against M.C. but not for the amended dates and not for the offenses against J.H. and C.E.

At the close of evidence, the post-conviction court took the matter under advisement. In its written order denying post-conviction relief, the post-conviction court accredited trial counsel's testimony that the petitioner did not wish to have three separate trials. The post-conviction court also found that trial counsel had all the discovery

materials before trial and that, because the petitioner maintained his innocence, trial counsel was not deficient in failing to seek a bill of particulars. As to counsel's failure to seek a change of venue, the post-conviction court found that "[t]he nature and conduct of the pre-trial publicity was not sensational or unfairly prejudicial," noting that the trial court had no difficulty selecting a jury from Lauderdale County. The court concluded that the petitioner failed to satisfy the factors to necessitate a change of venue.

The post-conviction court also found that trial counsel interviewed witnesses in preparation for the case and that the petitioner failed to establish counsel's deficient performance on that matter. Furthermore, the post-conviction court concluded that the petitioner failed to show that he was prejudiced by Juror A's presence as an alternate juror because she did not participate in jury deliberations. Similarly, the post-conviction court found that trial counsel was not surprised by the change of dates in the amended indictment and that he decided not to object because the State could have sought a superseding indictment. Finally, the court concluded that several of the alleged instances of deficient performance were tactical decisions by trial counsel.

In this timely appeal, the petitioner alleges 24 instances of trial counsel's deficient performance.

We view the petitioner's claim with a few well-settled principles in mind. Post-conviction relief is available only "when the conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." T.C.A. § 40-30-103. A post-conviction petitioner bears the burden of proving his or her factual allegations by clear and convincing evidence. *Id.* § 40-30-110(f). On appeal, the appellate court accords to the post-conviction court's findings of fact the weight of a jury verdict, and these findings are conclusive on appeal unless the evidence preponderates against them. *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997); *Bates v. State*, 973 S.W.2d 615, 631 (Tenn. Crim. App. 1997). By contrast, the post-conviction court's conclusions of law receive no deference or presumption of correctness on appeal. *Fields v. State*, 40 S.W.3d 450, 453 (Tenn. 2001).

Before a petitioner will be granted post-conviction relief based upon a claim of ineffective assistance of counsel, the record must affirmatively establish, via facts clearly and convincingly established by the petitioner, that "the advice given, or the services rendered by the attorney, are [not] within the range of competence demanded of attorneys in criminal cases," *see Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975), and that counsel's deficient performance "actually had an adverse effect on the defense," *Strickland v. Washington*, 466 U.S. 668, 693 (1984). In other words, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a

probability sufficient to undermine confidence in the outcome." *Id.* at 694. Should the petitioner fail to establish either deficient performance or prejudice, he is not entitled to relief. *Id.* at 697; *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). Indeed, "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." *Strickland*, 466 U.S. at 697.

When considering a claim of ineffective assistance of counsel, a reviewing court "begins with the strong presumption that counsel provided adequate assistance and used reasonable professional judgment to make all significant decisions," *Kendrick v. State*, 454 S.W.3d 450, 458 (Tenn. 2015) (citation omitted), and "[t]he petitioner bears the burden of overcoming this presumption," *id.* (citations omitted). We will not grant the petitioner the benefit of hindsight, second-guess a reasonably based trial strategy, or provide relief on the basis of a sound, but unsuccessful, tactical decision made during the course of the proceedings. *Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994). Such deference to the tactical decisions of counsel, however, applies only if the choices are made after adequate preparation for the case. *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).

Here, the petitioner has failed to carry his burden to prove by clear and convincing evidence sufficient facts to support his claim that trial counsel performed deficiently. Trial counsel's accredited testimony established that he did not seek severance because the petitioner did not want to draw out the process with multiple trials. Furthermore, we agree with the post-conviction court that the petitioner failed to establish that he was prejudiced by Juror A's inclusion as an alternate juror. The petitioner offered no evidence that Juror A discussed her relationship with one of the victims and his family with the other jury members. Likewise, the petitioner presented no evidence of the alleged prejudicial media coverage of his case and, consequently, has failed to show that he was prejudiced by the failure to seek a change of venue.

Moreover, counsel's decision to not address certain inconsistent statements by the State's witnesses to avoid opening the door to further damaging evidence and to avoid giving the witnesses an opportunity to correct their statements was reasonable. Similarly, counsel's decisions to avoid questioning J.H. on his sexuality and his mental health treatment, to decline to respond to the State's alibi request or move for a mistrial, and to question potential jurors about whether a defendant should testify in his own defense were reasonable and strategic decisions under the circumstances. These are precisely the sort of strategic decisions to which trial counsel is afforded deference. *See Adkins*, 911 S.W.2d at 347.

Finally, the record supports the post-conviction court's finding that trial counsel was not surprised by the State's amending the dates of the offenses involving M.C.

Counsel testified that he hoped that the State would not notice the incorrectly alleged dates but was not surprised by the State's motion to amend the dates. He also testified that he discussed the matter with the petitioner and that he did not object to the State's motion to amend because the petitioner elected to press forward with the trial to avoid delay. Consequently, the petitioner's alleged instances of trial counsel's deficient performance lack merit.

Accordingly, the judgment of the post-conviction court is affirmed.

_____
JAMES CURWOOD WITT, JR., JUDGE